## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TENESHA CANNON INDIVIDUALLY** | * | |
| **AND O/B/O HER MINOR SON** | * | |
| **D.C.** | * | **CASE NO. 3:21-cv-389** |
| | * | |
| **VS.** | * | |
| | * | |
| **CITY OF BATON ROUGE;** | * | |
| **MURPHY J. PAUL, JR. IN HIS** | * | |
| **OFFICIAL CAPACITY AS CHIEF** | * | |
| **OF POLICE, BATON ROUGE** | * | |
| **POLICE DEPARTMENT;** | * | |
| **OFFICER ALVARO ALVAREZ;** | * | |
| **SERGEANT LORENZO COLEMAN;** | * | |
| **OFFICER TRAVIS WILLIAMS;** | * | |
| **CORPORAL DOUGLAS SCHUTZ;** | * | |
| **CORPORAL KIRT ALLEN;** | * | |
| **OFFICER WESLEY CHANDLER;** | * | |
| **CORPORAL TODD THOMAS;** | * | |
| **CORPORAL JAMES THOMAS** | * | |

*********************************************************************************

## COMPLAINT WITH JURY DEMAND

NOW INTO COURT, through undersigned counsel, comes the Plaintiff, Tenesha Cannon

individually and on behalf of her minor son, D.C., who both reside and are domiciled in East Baton

Rouge Parish, and respectfully represent the following:

## PARTIES

1.

Made Defendants herein are the following:

a) THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, a local
government entity and body politically created by statute, being a municipality, and
political subdivision of the State of Louisiana, but not an agency, or department, or arm of
the State of Louisiana (hereinafter sometimes referred to as "City," "Parish," "City-
Parish"), and owns, operates, manages, directs, and controls the Baton Rouge Police
Department ("BRPD"), which employs all defendant officers and Defendant Murphy Paul;

1

b) CHIEF MURPHY PAUL, is and was at all relevant times the Chief of BRPD, a person of full age and majority domiciled in East Baton Rouge Parish. He is sued in both his individual and official capacity;

c)  ALVARO ALVAREZ, was at all relevant times to this complaint an officer in the Baton Rouge Police Department, is a person of full age and of majority, domiciled in East Baton Rouge Parish. He is sued in his individual capacity;

d) SERGEANT LORENZO COLEMAN, was at all relevant times was employed by the Baton Rouge Police Department, was the supervisory officers during the events of the incident described herein, and, upon information and belief, is a person of full age and of majority. He is sued in his individual capacity;

e) TRAVIS WILLIAMS, was at all relevant times to this complaint an officer in the Baton Rouge Police Department, is a person of full age and of majority, domiciled in East Baton Rouge Parish. He is sued in his individual capacity;

f) CORPORAL DOUGLAS SCHUTZ, was at all relevant times to this complaint an officer in the Baton Rouge Police Department, is a person of full age and of majority, domiciled in East Baton Rouge Parish. He is sued in his individual capacity;

g) OFFICER WESLEY CHANDLER, was at all relevant times to this complaint an officer in the Baton Rouge Police Department, is a person of full age and of majority, domiciled in East Baton Rouge Parish. He is sued in his individual capacity;

h) CORPORAL KIRT ALLEN, was at all relevant times to this complaint an officer in the Baton Rouge Police Department, is a person of full age and of majority, domiciled in East Baton Rouge Parish. He is sued in his individual capacity;

i) CORPORAL TODD THOMAS, was at all relevant times to this complaint an officer in the Baton Rouge Police Department, is a person of full age and of majority, domiciled in East Baton Rouge Parish. He is sued in his individual capacity;

j) CORPORAL JAMES THOMAS, was at all relevant times to this complaint an officer in the Baton Rouge Police Department, is a person of full age and of majority, domiciled in East Baton Rouge Parish. He is sued in his individual capacity;

k) XYZ INSURANCE COMPANY, an insurance company authorized to do, and doing business in the State of Louisiana providing general liability coverage and/or Excess of Loss Coverage for Chief Paul, all defendant officers, and/or City of Baton Rouge for any and all acts and damages occurring from this incident and all EXCESS DAMAGE CLAIMS, incurred in the City of Baton Rouge on behalf of all named Defendants.

l) At all times relevant to this complaint, all defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to plaintiff.

2

m) At all times to this Complaint, all defendants acted under the color of state law.

## JURISDICTION AND VENUE

2.

The United States District Court has jurisdiction over the subject matter of this complaint under 42 U.S.C. 1983 and 28 U.S.C. 1331, 1343(a)(3), and 1367(a).

3.

The Middle District of Louisiana is the appropriate venue to bring this complaint, because the facts that give rise to Plaintiff's claims all took place within the Middle District of Louisiana.

## FACTUAL ALLEGATIONS SURROUNDING JULY 6, 2020

4.

On May 25, 2020, George Floyd was killed by Minneapolis police officer Derrick Chauvin when Chauvin kneeled on Mr. Floyd's neck and back. The murder was caught on video, which went viral and sparked widespread media attention and protests nationwide.

5.

Exactly six weeks later, on July 6, 2020, BRPD Officer Travis Williams was working overtime on a BRPD seatbelt enforcement assignment near the 2400 block of Fairfield Avenue in Baton Rouge, Louisiana.

6.

D.C.—an unarmed teenager—was riding as a passenger in a red Toyota Corolla that passed Officer Williams. D.C. was only ever a passenger and never controlled the car.

7.

At approximately 4:40 p.m., Williams initiated a traffic stop of the car for the alleged violation of failure to wear a seatbelt.

8.

The driver of the car, Kamani Smith, did not stop. Contrary to BRPD policy, Officer Williams chased after the Corolla and called out the pursuit over the police radio.

9.

BRPD Officer Alvaro Alvarez was on duty, heard Williams' radio transmissions, caught up with Officer Williams and joined in the pursuit. Additional officers quickly joined in the pursuit. Up to 16 officers were in the pursuit at various times.

10.

Sergeant Lorenzo Coleman heard the pursuit over the radio and responded without being assigned. In a subsequent investigation and report conducted by Hillard Heintze, Coleman stated he was the supervisor who monitored the pursuit to ensure it did not "put officers and the general public in harm's way" or "endanger the community" and said he considered it his responsibility to call off the pursuit if it became "extremely dangerous."

11.

The pursuit was mainly through residential areas, clearly against BRPD policy and putting the public at great risk over an alleged seatbelt violation. Nevertheless, no officers called it off.

12.

D.C. remained as a passenger and was never in control of the car or its operation.

13.

At approximately 5:31 p.m., Mr. Smith stopped the Corolla at the intersection of North Acadian Thruway West and Bogan Walk. At that time, Mr. Smith and D.C. immediately opened their car doors.

14.

Mr. Smith sat in the driver's seat, facing out of the vehicle with his feet on the pavement and his hands extended in the air above his head. D.C. exited the passenger side with his hands extended above his head and kneeled on the pavement beside the open passenger-side door.

15.

D.C.'s hands were visible at all times. D.C. never presented a physical threat to police officers. D.C. was never armed.

16.

Defendants Williams, Coleman, and Schutz drew their service weapons and pointed them at Mr. Smith.

17.

Corporal Kirt Allen exited his squad car holding K9 Bruno by his collar and instructed Smith to exit the Corolla and turn around. Mr. Smith then exited the Corolla with his hands above his head and walked away from the driver side door toward Officer Williams. Officer Williams instructed Mr. Smith to get on the ground. Mr. Smith went down on his knees onto the pavement with his hands still extended above his head. Sergeant Coleman, Corporal Todd Thomas, and Corporal James Thomas approached Mr. Smith and placed him in handcuffs. Mr. Smith complied with all commands.

18.

As officers handcuffed Mr. Smith, Officer Williams walked toward the passenger side of the Corolla. Officer Williams and Officer Chandler pointed their guns at D.C. and ordered him to lay on the ground as they approached.

19.

Officer Alvarez retrieved his handcuffs from his handcuff pouch and walked toward D.C. who remained on his knees with his hands in the air.

20.

Chandler used his left hand to grab D.C.'s jacket near his shoulder and forcefully pushed D.C. to the hard pavement as D.C. was already complying with commands. D.C. laid down on his stomach.

21.

Officer Chandler then used his right hand to point his gun at terrified, teenage D.C. at very close range.

22.

As D.C. lay helplessly on the ground with his hands in full view, Officer Alvarez held D.C.'s left arm with his left hand and reached to D.C.'s left wrist with his right hand. Simultaneously, Williams, who stood crouched on D.C.'s right side, held D.C.'s right wrist.

23.

Young and lanky, D.C. was surrounded by numerous officers and complied with all demands throughout the entire encounter. He did not resist at any time, as confirmed by the Hillard Heintze investigation and report.

24.

Officer Alvarez then placed his left knee on the back of D.C.'s neck as he grabbed and pulled D.C.'s left wrist behind his back. Alvarez' right knee was on the pavement next to D.C.'s head.

25.

At the same time, Officer Williams yanked D.C.'s right wrist and pulled it up behind his back, assisted by Officer Chandler, to enable Officer Alvarez to place the second cuff on D.C.'s right wrist. Three armed officers forcefully handcuffed 16-year-old D.C. who was compliant the whole time and never resisted in any way.

26.

Officer Alvarez's knee was pressing on D.C.'s neck for close to 30 seconds, restricting his ability to breathe, before the arresting officers collectively jerked him up off the ground, yanking his arms backwards.

27.

D.C. informed the officers that he has asthma to which one of the officers can be heard on body camera footage replying, "I don't give a damn."

28.

All officers involved in the pursuit acted recklessly and broke BRPD protocol. Under BRPD General Order 136 I(A), Vehicle Pursuits, BRPD authorizes vehicle pursuits only if *all* the following criteria are met: (1) The suspect exhibits the intention to avoid apprehension through evasive or unlawful tactics, (2) The suspect operating the vehicle refuses to stop at the direction of the officer, and (3) The violation is such that a failure to pursue would further enhance the danger presented to the public.

29.

The Hillard Heintze investigation and report concluded that Mr. Smith's failure to wear a seatbelt was not such that the failure to pursue would enhance the danger to the public. It also found that the single motor vehicle code violation – failure to wear a seatbelt – would not normally result in arrest or create immediate danger to the public.

30.

Additionally, under BRPD policy, officers must immediately terminate vehicle pursuits when the danger posed by continued pursuit to the public, the officers or the suspect is greater than the value of apprehending the suspect. The danger to the public from a vehicle pursuit is greater than the danger to the public from a seatbelt infraction violator remaining at large.

31.

Though Sergeant Lorenzo Coleman claimed responsibility for the supervision of the chase, he never called it off, in clear violation of BRPD policy and at great peril and risk to the public.

32.

No other participant officer or supervisory officer in BRPD called off the chase based on a seatbelt violation.

33.

While BRPD and Hillard Heintze contend that Alvarez's knee was on D.C.'s shoulder, the body camera footage, and the cell phone videos taken by bystanders, clearly indicates that the knee was squarely on D.C.'s neck and back, even though D.C. was not the driver of the car, was never in control of the car, complied with all commands throughout the entire encounter, never resisted arrest, and is a minor.

34.

No other participant officer or supervisory officer in BRPD intervened when Alvarez's knee was pressing on D.C.'s neck.

35.

As a result of Defendant Officers actions and inactions, D.C. had to wear a neck brace.

36.

Numerous state and federal lawsuits against BRPD demonstrate a pattern, custom, and practice of excessive use of force, especially against people of color. These suits include, but are not limited to, the following:

A.  In 2021: Following a traffic stop and subsequent arrest of a Black male driver and his minor passenger, the officers drove them to their mother's home, where the officers inexplicably invaded the home with their guns drawn. The police reports for the initial traffic stop were revised nearly one dozen times after the arrest. After the case settled, the officer's body-camera footage— which was already publicly available for six months prior— was released by the family's attorney to the media. The footage revealed that the officers strip-searched the minor child in public in broad daylight, exposing his genitals, and further verbally battered and threatened him. The attorney was subsequently charged with contempt in an apparent attempt to punish him for revealing the truth;

B.  In 2020: Without provocation, a police officer pushed and punched a man almost a dozen times in the face. The officer's body-camera footage reveals extreme injuries to the man's face as he is restrained on the police car, in a pool of his own blood after his beating. The sustained injuries required extensive surgery and dental repair;

C.  In 2019:

   a.  As a man sat outside his own home on his motorcycle, two officers pulled up next to him and knocked him off, tased him, and repeatedly punched him in his face and body while he was handcuffed—all because they suspected he had a small amount of marijuana;

b.  After officers were called to the scene of a domestic dispute, the woman who called for help showed the officers proof of her hair torn out, claw marks on her neck and chest, a busted and swollen lip, and blood on her chest.  However, officers thereafter arrested and imprisoned the victim and released her abuser;

c.  During an unlawful arrest, an officer pistol whipped a man in his face and head, causing him severe injuries;

d.  A woman was driving in a southbound lane on a city street when an officer driving northbound negligently turned left directly in front of oncoming traffic, striking the woman's car and causing her permanent injuries;

D.  In 2018:

a.  A BRPD officer fired his service weapon at an unarmed man, then falsified reports surrounding details of the event and further untruthfully claimed that the man shot first. The officer had turned off his body camera at the time and had failed to get his dash camera in operational working order. However, his rear dash cam captured the audio of only one shot being fired, and the only bullet recovered was from the officer's gun;

b.  As a man allegedly ran away from an officer and Department of Child and Family Services worker, the officer discharged his taser two or three times, handcuffed him, and then shot him while he lay defenselessly handcuffed on the ground. He remained alive and in agony for several minutes before he eventually died on the scene;

c.  A BRPD officer grabbed a compliant man outside a concert venue by his throat while another officer repeatedly struck his leg and his face, causing extreme

bleeding. He was taken to prison without medical treatment and was unconscious four times before he was taken to the hospital for severe injuries;

E.  In 2017: Numerous lawsuits were filed against BRPD for the use of military weapons, chemical agents, and excessive force against unarmed civilians, the majority of whom were Black, consistent with proven racially discriminatory policy, practice, and patterns in the department. These lawsuits further alleged that officers targeted Black leaders of organizations during peaceful protests and beat, intimidated, and imprisoned them without just cause or proof of any crime. Allegations of excessive force in these abundant, credible civil actions include:

   a.  Beating, choking, kicking, and dragging people from private and public property without just cause and in violation of their constitutional rights;

   b.  Police officers with rifles, batons, shields, and armored vehicles pointing loaded long guns at a minor;

   c.  Heavily armed officers in military grade gear throwing a man to the ground, slamming his head onto the concrete, and holding him down while they kicked him. The man lost consciousness and had abrasions all over his body. The officers then handcuffed the man, drug him across the street, and struck him in the head with a blunt object. He was forced to sit on the ground— grotesquely injured and bleeding excessively— for over an hour before an ambulance arrived;

   d.  Officers also denied medical treatment to the individuals they assaulted and battered;

F.  In 2016:

a.  Two officers beat a minor child by repeatedly striking him in his face and neck while three other officers actively restrained the minor on the ground. After a brief trip to the hospital, officers transported him to the East Baton Rouge Parish Prison rather than the juvenile detention center. The child faced no charges;

b.  After an officer was called to escort a young college girl home because she was intoxicated, the officer entered her home and had non-consensual sex with her. The girl woke up without clothes on and no recollection of the sexual encounter. The officer allegedly left the door unlocked and returned to have non-consensual sex with her again while she was still unconscious before locking the door at his final departure;

c.  In the absence of both probable cause or a warrant, police invaded a private residence and used excessive force to arrest and imprison individuals who had previously been peacefully protesting;

d.  Officers pulled over a woman for suspicion of marijuana use, aggressively pulled her out of her vehicle, and verbally abused her. The woman was taken by a female deputy behind a fence alone and strip searched but nothing was found. A year later, officers followed the woman to her house where they deployed K-9 dogs on her, issued violent verbal threats upon her, and high-fived each other as she was attacked by the dogs;

e.  An officer arrested two journalists as they stood on a public sidewalk taking photos of BRPD officers from a distance. One of the journalists was taken to a substation where he was booked and forced to watch prison rape videos over a ten-hour period. The journalist was not prosecuted on any charges;

G. In 2015:

    a.  Officers grabbed a man by his neck and physically slammed him first into a metal handrail, and then onto the concrete ground. Two more BRPD officers swarmed the man while he was lying handcuffed, helpless and compliant. They shoved, choked, and kicked him;

    b.  A plain-clothes officer entered a woman's house to arrest her for prostitution. While she was already handcuffed, the officer excessively beat her, causing severe and disabling injuries;

    c.  Officers arrested a complaint citizen exercising his lawful right to possess a firearm with a license, verbally abused him, and shoved into the back of the police vehicle using hard control techniques that are reserved for active aggression. The guns were unlawfully retained and were not returned to the man;

H. In 2014:

    a.  While executing a no-knock search warrant, masked and armed officers severely and unmercifully beat a man as he lay handcuffed on the ground pleading for help because he could not breathe. The officers committed these brutal acts in the presence of his wife, and the man subsequently died in front of her. In leaked photographs of the scene, blood can be seen pooled around the home and smeared across the walls. Officers allegedly bragged about this event for many years and referred to it as the "Flag Street Massacre;"

    b.  As a woman sat on her porch, an officer pulled up, drew his service weapon on her, and while continuing to point his gun at her, yelled profanity and racial slurs at her. The woman informed the officer that she had a severe heart condition, but he

13

continued to be physically aggressive to her and her son. Another officer pointed a gun at a man who was present, yelled racial slurs at him, and threatened to "blow [his] fucking brains out." None of the victims were charged with any crimes;

c.  Twenty masked and armed officers kicked down the door of a man's home without a warrant or probable cause. An officer curb stopped the man's face into the floor, forcing his teeth out of his mouth and onto the floor. Blood pooled from him face, and from his arm that was pushed into broken glass. The officers denied him medical care, teased him about his injuries, strip searched him in his home, and without reasonable suspicion, unlawfully searched and damaged his vehicle.

d.  At the alleged direction of the former mayor, and after lying to a judge to obtain a warrant, officers stormed a woman's residence in the early morning hours while she was asleep, asked her questions about her personal relationship with the former BRPD chief, and refused to let her call her attorney or see the warrant. Officers allegedly copied the entirety of the woman's cell phone and used personal and private contents of the cell phone in an unredacted report made publicly available to the media;

I.  In 2011: Following a severe motorcycle crash, the victims' son who witnessed the crash ran to his father's aid. As the officer violently pushed the son, and when the already injured mother came to help, he pushed her into a ditch, drug her out by her hair, and then charged her with battery of an officer;

J.  During an unlawful arrest, officers utilized martial arts techniques and applied a choke hold, causing the man to lose consciousness, fall to the ground, and smash his head on the concrete. While he lay unconscious in handcuffs, the officers continued to beat him.

37.

Additionally, in 2021, a whistleblower from within BRPD exposed countless egregious actions by members of the narcotics unit, including by superior officers. Among others, BRPD officers were alleged to have targeted Black and brown communities, planted drugs on innocent individuals, and even allegedly killed a man during the execution of a no-knock warrant, and then covered it up. These actions span at least ten years and many have been proven through investigations both outside and within BRPD.

38.

The above lawsuits and events demonstrate that the incident with D.C. is not an outlier but rather part of a continuing pattern, custom, and practice of BRPD.

39.

Upon information and belief, BRPD, has not changed their hiring, training, or supervision policies and their enforcement despite the numerous use of force complaints and lawsuits.

40.

Further, BRPD has a long history of not properly disciplining or firing officers when they engage in illegal or improper conduct, including excessive use of force and improper deadly use of force.

41.

BRPD's excessive use of force and improper deadly use of force cases show a clear pattern of excessive and improper use of force against citizens like D.C.

42.

Defendant Officers Alvarez, Coleman, Williams, Schutz, Allen, Chandler, T. Thomas, A. Thomas extreme misconduct was a product of this environment and undertaken pursuant to de

facto policies, practices, and/or customs—both written and unwritten—of BRPD. Defendants

BRPD, City, and Paul are guilty of the following wrongful acts, including but not limited to:

(a)  Failing to properly hire, supervise, and train BRPD Officers;
(b)  Failure to promulgate, train, and enforce an adequate and constitutional use of force policy;
(c)  Failure to promulgate, train, and enforce an adequate and constitutional de-escalation tactics;
(d)  Failing to reprimand and discipline BRPD officers who engage in misconduct and/or break BRPD protocols;
(e)  Failing to retrain and/or otherwise control BRPD officers who engage in excessive force against civilians;
(f)  Failing to follow appropriate policies and procedures to address and correct repeated use of excessive force;
(g)  Failing and inadequately investigating complaints and allegations of excessive force and other misconduct by BRPD officers;
(h)  Failure to require and enforce BRPD officers to accurately and timely report misconduct they are aware other BRPD officers are conducting or have conducted;
(i)  Failing to retrain and otherwise control BRPD officers who engage in excessive force;
(j)  Failing to retrain and otherwise control BRPD officers who interfere with the functions of their body worn cameras;
(k)  Tacitly approving of BRPD officers using their power and position to interfere with other citizens' rights;
(l)  As a matter of both policy and practice the BRPD facilitating this type of misconduct by failing to protect civilians from reckless indifference of Defendant's agents, servants, and employees in its Police Department; and
(m)  Allowing the practice and custom of a "police code of silence," resulting in BRPD officers refusing to report instances of police misconduct of which they are aware.

43.

As a direct result and proximate result of the conduct of Defendants, Plaintiff suffered and

continues to suffer extraordinary damages, including the prolonged loss of liberty, emotional

distress, and trauma, loss of the enjoyment of life, psychological harm, and pain and suffering,

some of which may be permanent, as well as financial losses.

**CAUSES OF ACTION**

**Count I**
**Federal Constitutional Claims**
**Plaintiff v. Defendants Alvarez, Coleman, Williams, Schutz,**
**Allen, Chandler, T. Thomas, A. Thomas**

44.

The actions and inactions of Defendants Alvarez, Coleman, Williams, Schutz, Allen, Chandler, T. Thomas, A. Thomas violated D.C.'s rights under the Fourth and Fourteenth Amendments to be free from the unlawful use of force.

45.

Defendant Alvarez's knee on D.C.'s neck and other use of force caused D.C.'s mental anguish and pain. The inaction of Defendants Coleman, Williams, Schutz, Allen, Chandler, T. Thomas, A. Thomas caused the same.

46.

The actions of Defendant Alvarez were intentional, excessive, and unreasonable.

## Count II
## Federal Constitutional Claims

**Plaintiff v. Defendant Paul in his Official Capacity and Defendant City**

47.

The actions or inactions of Defendant Paul in his Official Capacity and Defendant City violated the Plaintiff's Fourth and Fourteenth Amendments Rights to the U.S. Constitution, directly or proximately causing his injuries suffered due to their failure to train, supervise, and discipline Defendant Officers Coleman, Williams, Schutz, Allen, Chandler, T. Thomas, A. Thomas.

48.

The actions or inactions of Defendant Paul in his Official Capacity and Defendant City violated the Plaintiff's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution directly or proximately, causing the Plaintiff's injuries by creations of or failure to correct unconstitutional policies, practices, patterns, and/or customs, as evidenced by preceding paragraphs 36-41.

**Count III**
**Federal Constitutional Claims**

**Plaintiff v. Defendant Paul in his Official Capacity and Defendant City**

49.

The violations of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments to the U.S. Constitution, Plaintiff's damages, and/or the conduct of the individual Defendants were directly and proximately caused by the actions and/or inactions of the Defendant City and Defendant Paul in his Official Capacity, which have encouraged, tolerated, ratified, and has been deliberately indifferent to the following policies, patterns, practices, and customs, and to the need for more or different training, supervision, investigation, or discipline in the areas of:

(a)   Use of force by police officers;
(b)   Police officers' duties and responsibilities to engage in proper de-escalation techniques;
(c)   The proper exercise of police powers, including not limited to the making of an arrest and the use of force;
(d)   Police Officers duties not to un-necessarily use force;
(e)   The monitoring of officers whom it knew or should have known were suffering from emotional and/or psychological problems that impaired their ability to function as officers;
(f)   The failure to identify and take remedial or disciplinary action against deputies who were the subject of prior civilian or internal complaints of misconduct;
(g)   Failing to retrain and/or otherwise control deputies who engage in excessive force;
(h)   Failing to follow appropriate policies and procedures to address and correct repeated use of excessive force;
(i)   The hiring and retention of deputies who are unqualified for their employment positions;

(j)     Failure to require, discipline, and supervise BRPD officers for not reporting illegal, impermissible, improper, or any other conduct of other BRPD officers that is unbefitting of an officer or violates BRPD policies and protocols;

(k)     BRPD's use of their status as officers to employ the use of force or to achieve ends not reasonably related to their law enforcement duties;

(l)     The failure of officers to follow established policies, procedures, directive, and instructions regarding arrests, use of force, and institution of criminal charges under such circumstances as presented by this case;

(m)    The failure to properly sanction or discipline deputies who are aware of and conceal and/or aid and abet violations of constitutional rights of citizens by other Baton Rouge Police Department officers;

(n)     As a matter of both policy and practice, the City and Defendant Paul actively facilitate this type of misconduct by failing to protect civilians from reckless indifference of Defendant's City agents, servants, and employees in its Police Department, despite the numerous complaints and lawsuits laid out in the preceding paragraphs herein.

### Count IV State Law Claims

### Plaintiff v. Defendants Alvarez, Coleman, Williams, Schutz, Allen, Chandler, T. Thomas, A. Thomas

50.

Plaintiff alleges that Defendants Alvarez, Coleman, Williams, Schutz, Allen, Chandler, T. Thomas, A. Thomas are responsible and liable for the damages and injuries he has suffered as a result of said Defendants' actions and/or inactions pursuant to Louisiana Code of Civil Procedure Article 2315, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it"; Article 2316, which provides that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill"; and Article 2317, which provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."

51.

The actions and/or inactions of Defendants Alvarez, Coleman, Williams, Schutz, Allen, Chandler, T. Thomas, A. Thomas under the law of the State of Louisiana, constitute the torts of:

(a)   Assault;
(b)   Battery;
(c)   Intentional Infliction of Emotional Distress;
(d)   Abuse of Process;
(e)   Malfeasance in Office; and
(f)   Negligence.

### Count V State Law Claims

### Plaintiff v. Defendant Paul in his Official Capacity and Defendant City

52.

Plaintiffs alleges that Defendants Paul and City are responsible and liable for the damages and injuries they have suffered as a result of the Defendants' actions and/or inactions pursuant to Louisiana Code of Civil Procedure Article 2315, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it"; Article 2316, which provides that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill"; Article 2317, which provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody"; and Article 2320, which provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed...responsibility only attaches, when the masters or employers...might have prevented the act which caused the damage, and have not done it."

53.

The actions and/or inactions of Defendant Paul in his Official Capacity and Defendant City, under the law of the State of Louisiana, constitute the torts of:

(a)   Assault;
(b)   Battery;
(c)   Intentional Infliction of Emotional Distress;

(d)    Negligent Hiring;
(e)    Negligent Retention;
(f)    Negligent Supervision;
(g)    Abuse of Process; and
(h)    Malfeasance in office.

## PRAYER FOR RELIEF

The Plaintiff respectfully requests:

(a)    Compensatory damages as to all Defendants;
(b)    Special Damages as to all Defendants;
(c)    Punitive damages as to Defendants Alvarez, Coleman, Williams, Schutz, Allen, Chandler, T. Thomas, A. Thomas;
(d)    Reasonable attorneys' fees and costs as to all Defendants; and
(e)    Such other and further relief as may appear just and appropriate.

WHEREFORE, Plaintiff, prays that a copy of the above petition is served upon all of the Defendants named herein, and that after all proceedings a judgment is rendered in favor of Plaintiff and against Defendants for all relief deemed equitable under the law including attorney's fees and costs.

Respectfully submitted,

/s/ Christopher J. Murell
Christopher J. Murell (#32075)
Lewis O. Unglesby (#12498)
Lance C. Unglesby (#29690)
Adrian F. Simm (#36673)
**Unglesby Law Firm**
246 Napoleon Street
Baton Rouge, Louisiana 70802
Telephone: (225) 387-0120
Fax: (225) 336-4355
Chris@unglesbylaw.com
Lance@unglesbylaw.com

Ronald S. Haley, Jr. (#30900)
**Haley & Associates**
8211 Goodwood Blvd., Suite E
Baton Rouge, Louisiana 70806
Telephone: (225) 663-8869

Fax: (225) 888-900-9771
Rhaley@ronaldhaleylawfirm.com

Dedrick A. Moore (#30329)
**Dedrick A. Moore**
**Attorneys at Law, LLC**
4962 Florida Blvd.
Baton Rouge, Louisiana 70806
Telephone: (225) 412-0412
Fax: (225) 412-0414